PEOPLE, PLAINTIFF AND APPELLEE, *v.* RIVERA, DEFENDANT AND APPELLANT.

APPEAL from the District Court of Mayagüez in a Prosecution for Murder in the First Degree.

No. 1110.—Decided July 28, 1917.

MURDER—EVIDENCE—MEDICAL EXPERT—JURY.—The opinion given by a medical expert during a trial for murder in the first degree to the effect that wounds in the back were first inflicted should be excluded from the consideration of the jury and the jury should be left absolutely free to draw its own conclusions on this point.

ID.—ID.—DELIBERATION AND PREMEDITATION.—After examining the evidence in this case it was held that the circumstances do not show the deliberation and premeditation necessary to sustain a conviction of murder in the first degree.

The facts are stated in the opinion.

*Messrs. Ricardo del Toro Soler, M. del Toro Colberg* and *Marcelino Romany* for the appellant.

*Mr. Salvador Mestre, fiscal,* for the appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

Salvador Amill Negroni left the dwelling on his coffee plantation about four o'clock in the afternoon, and some eight or ten hours later his body was found by the side of a trail within the boundaries of the same property. His watch, the crystal of which was broken, had stopped at 4:40 p. m.

Telesforo Rivera Camacho, who confessed the killing, was convicted of murder in the first degree.

A physician and surgeon testified in substance as follows:

"* * * he examined the body of said Amill Negroni, the same presenting the following wounds: Three incised wounds in the anterior region of the thorax and another incised wound, also in the thorax but in the dorsal region thereof; those in front all were in the fourth intercostal space, one of them, the first and most important, was situated over the precordial region in the fourth intercostal space, in an oblique direction; on the skin and by reason of the froth around it there were evident and conclusive indications that the wound had been inflicted during life and that the victim had breathed through the same. Another wound alongside the one above described, in the same intercostal space, the fourth, parallel to that above mentioned and to the axis of the body; another of the same kind, also penetrating the thorax, very near, one centimeter from the sternum, which almost broke the joint of the sternum, with the corresponding rib, and a little wound near the one last above mentioned which only penetrated the skin. Therefore there were three penetrating wounds and another that did not penetrate. One over the right clavicular region, among the scalene muscles, very deep, downward and inward. Another incised wound severed the entire lobe of the right ear and terminated at the mastoid apophysis. Another wound severed the right dorsal portion of the nose, and almost from the base of the last above mentioned began another which gouged out the right eye, the point of the weapon having penetrated the super-external angle of the orbit. Another incised wound over the right parietal bone, throughout the length thereof, penetrating to the bone and cutting all the muscles of the epicranium. There was another incised wound in the right hand in the space between the metacarpian bones of the ring and middle fingers; the weapon entered the back of the hand and came out through the palm, lacerating the latter. Another incised wound in

the deltoid region of his left arm, of little importance; and in the posterior part of the body there was a wound in the left scapula region penetrating the chest—no, this was not a penetrating wound but another one farther down toward the scapula angle which was quite penetrating—and another at the level of the third dorsal vertebræ penetrating the thorax. These were the wounds inflicted and found on the body, a total of fourteen wounds, out of which three of the four wounds inflicted in the precordial region were necessarily fatal. He believes that the wounds in the back were inflicted previously to those in front. One of these was a penetrating wound but none probably fatal. The wound in the back of the hand, between the two metacarpian bones corresponding to the ring and middle fingers, was a penetrating one and came out through the palm, lacerating it; the wound which gouged out the right eye started from the base of the nose, and the point of the weapon stopped in the super-external angle of the orbit; the expert believes that these wounds may have been inflicted with a sharp-pointed dagger with a thin and triangular blade, but he cannot state accurately its thickness, with which these wounds could be inflicted without breaking the dagger if it were well tempered and wider at the hilt than at the point. That he examined the cadaver at 2 p. m., in Maricao, about twenty-four hours after death * * *.

"On cross-examination he says that he was a friend of Salvador Amill Negroni; that he cannot give an absolutely exact statement about the order in which the wounds were inflicted; that given the number of wounds, the location thereof, as to whether a struggle might have taken place between the deceased and his assailant, witness is of the opinion that the wounds first inflicted were those in the back; that Amill was fleeing and that on feeling himself seriously wounded by the penetrating wound in the thorax, he turned to repel the assault and then received the other wounds; that the first in front disabled him for the rest of the attack. The witness believes that Amill might have gone with his back toward the defendant, because any one of the wounds in front, already described, disabled him at once for any fight, because the hemorrhage must have been frightful in a heart wound; that the time intervening before death, after the fatal wounds were received, would depend on the time the assailant delayed in inflicting the three necessarily fatal wounds, although witness has formed the opinion that two of the wounds were inflicted when Mr. Amill was already dead, basing his opinion upon the nature of those wounds; the edges were

completely bloodless, the severed tissues did not resemble human flesh, without muscular fluid, and that is an efficient and clear character of wounds inflicted after death.   *   *   *.   That the wounds inflicted in the back were not necessarily fatal, there being only three fatal wounds.''

Not only did the opinion of this witness, to the effect that the wounds in the back were first inflicted, pass without challenge on direct examination, but the same was repeated and elaborated without protest in answer to questions by the defense. The cross-examination, however, develops more fully the total absence of any reason that could possibly justify the admission of expert testimony on this point which, in the circumstances of this case, was of vital importance; and in the oral argument at the hearing the failure to exclude such evidence from the consideration of the jury was urged by counsel who did not participate at the trial as a sufficient ground for reversal. Inasmuch as the judgment cannot stand for other reasons, we merely suggest that on a new trial the jury should be left free to draw its own conclusions in this regard. 11 R. C. L. p. 473, sec. 7; 591, sec. 19; 592, sec. 20; and 613, sec. 35; note to *Duncan* v. *Atchison T. & S. F. Ry. Co.,* 51 L. R. A. (N. S.) 565; 66 Am. Dec. 228, note 5; *Ferguson* v. *Hubbell,* 49 Am. Rep. 544; *Hanson* v. *Milwaukee Bridge* Co., 7 Am. & Eng. Ann. Cases, 458; *Dumas* v. *State,* 49 So. 224; *State* v. *Fontenet,* 23 So. 634; *Knoll* v. *State,* 12 N. W. 369; *People* v. *Hill,* 116 Cal. 562.

Timely objection was made to the fact that the verification states merely that the information is based on the testimony of witnesses examined under oath, instead of complying with the specific requirement of section 3 of the Code of Criminal Procedure, that the affidavit of the *fiscal* ''shall be sufficient if it states that the information is based on the testimony of witnesses, sworn before him, or upon the testimony of witnesses taken before an examining magistrate.   *   *   *.'' Such a defect is so easily cured by amendment and so much more easily avoided by following the statute

in the first place that when the question is promptly and properly raised in the court below we see no sound reason why, through insistence upon the sufficiency of a pleading notwithstanding such obvious irregularity, the way should be left open for a possible reversal on appeal. In the view we take of this case it seems hardly necessary, therefore, to pass upon the merits of this question at the present time.

The *fiscal* of this court calls attention to the close analogy between the case at bar and that of *People* v. *Crespo,* 21 P. R. R. 285, and expresses serious doubt as to whether there is sufficient proof of premeditation and deliberation, unless this court should regard certain circumstances enumerated by him and appearing from the testimony hereinafter set forth as enough to warrant an affirmance of the judgment below.

Aside from the bald opinion of the medical expert abovementioned, the only direct evidence as to what actually occurred is the statement of the accused made to different persons on the night of the homicide and repeated before the *fiscal* two days later, at which time it was reduced to writing. Subsequently, the defendant was called before the *fiscal* a second time, and after an extensive and detailed account of his travels and experiences covering a period of several days prior to the tragedy, accompanied that officer on a tour of investigation over the same ground, which apparently developed no contradiction or discrepancy whatever at any point.

In the first of the two statements last above-mentioned appellant said:

"I arrived at Vega Farm on Wednesday, about 2 p. m., and went to see my brother León Rivera, who is the overseer of the Vega Farm belonging to Attorney Salvador Amill. That I went to my brother's house and talked with Cándida, his wife, and as my brother was coming I left and went by the public highway for the purpose of getting some shoes from Ramón Cruz; that a little beyond the house of León, my brother, and on a road from the farm to the public high-

way, I met the lawyer who when he saw me said to me, 'How is it you are coming to entice the people from me?' and took me along the road saying that 'That is shameful on your part,' using profane language and saying that I was an indecent man in coming to entice my brother away. He also called me 'rascal,' 'son of a bitch,' 'dog,' 'you are a brute and a savage,' and then I told him to do me the favor not to provoke me. Then he stopped and struck me a blow in my face, on the right eye, and made a gesture as if to draw a revolver from the right pocket of his coat; and then I drew a double-edged knife which I had for peeling oranges and gave him a blow in the chest, then another and another, and then the lawyer fell and I don't know what I did, and continued stabbing him; that I left the lawyer in that place and went away towards Collado Farm, but when I crossed the Guaba river I washed a blood-stained sleeve of my coat.' That he does not know what he did with the knife; that he arrived at Collado Farm, at Zoilo Rodríguez' house, and then and there changed his clothes; that in the river he also washed a blood stain from his trousers.

"That the wife of Zoilo Rodríguez gave him the clothes for him to put on, and he left his own clothes there.

"That the affair with the lawyer happened about 3.30 p. m., more or less; that from the place where it took place to the house of Zoilo Rodríguez is about a half hour's walk; that he met no one either before or after said event.

"That from the house of Zoilo Rodríguez he went to the house or store at Collado farm belonging to Antonio Sifre accompanied by Francisco Caraballo, and they both went to the farm and there and then met the people coming to see what had happened at Vega Farm; that these people were the laborers of the Delfina Farm, which belongs to Juan Amill; that he joined the people and with them began to look for the lawyer whom they said had disappeared; that that was about eight o'clock at night, more or less; that the body was found by others going before him, who carried it to the lawyer's home; that when this occurred the witness was already under arrest, because all the laborers were arrested and an investigation was begun.

"That the witness was under the house, near Juan Bonilla, and heard the people say that 'some blood-stained clothes had been found,' and then he said to Bonilla, 'Those are my clothes;' that Bonilla told him, 'You must plead guilty.' 'Then they called Cancel, a policeman, and witness said those clothes were his and that he was the

author of the homicide, a statement repeated afterwards before the chief of police and others who were present.

"That on Collado Farm the wife of Zoilo asked him, 'What about that blow you have on your face?' and the deponent answered that in crossing the river he had slipped and fallen and received that contusion. That he made the same statement to Pepito Sifre who inquired of him about said blow.

"That he does not know what he did with the knife with which he committed the deed, said knife having been bought by him at Sabana Grande from a traveler for ten cents.

"That he does not know and cannot explain how the lawyer's body appears with wounds in the back, for he does not know what became of the knife, nor does he know how many wounds he inflicted.

"That before these events took place the witness had lived on the lawyer's farm for a year and a half, and that he left the farm on account of a woman with whom he was living and whom the lawyer did not desire to remain on his farm."

The second statement is in part as follows:

"* * * That he went to his brother's house but found neither him nor his wife. However, she, Cándida, arrived a little later and he talked with her, inquiring for his brother whom he came to tell that he was leaving for Guánica Centrale to work and expected to come back about two months later; that he is sure of having talked with Cándida; that from there he went up the hill to go to the house of Ramón Cruz to get the shoes, and then he met the lawyer who told him that he was enticing his employees away and provoked him with harsh words until reaching the little road entering the farm, 'and as we arrived at the place the lawyer struck me and then I used my knife.'

"That before arriving at his brother's house was when he ate the oranges, coming from the orange tree down to the road, which is before reaching his brother's house; that he went into his brother's house and looked through the window of the room whence a part of the *glasis* and house of the lawyer can be seen.

"That he was at his brother's house about noon and his sister-in-law made some coffee and cooked a few bananas.

"Asked to tell why he went to his brother's house after so long a time had elapsed since he had seen him, he answered that it had been only a little more than a month. That the body remained on

the road, and that he is sure he had not left it in the ditch among the trees.

"That he talked with the lawyer for about fifteen minutes before the event; that Attorney Amill walked in front and the witness behind along the trail, and when they arrived at the place where the incident occurred 'I told him that I could not offend him, that I respected him; and then he struck me and told me that he ought to shoot me, and then I stabbed him.'"

In neither of these two rehearsals is there any substantial variance from the details as given by the accused in the presence of various witnesses on the night the body was found, and the only direct contradiction is in the testimony of Cándida Cruz, *infra,* who denies the conversation mentioned by the defendant in his second interview with the *fiscal.*

So much of the testimony as we deem necessary to set forth herein follows:

"EPIFANIO ALMODÓVAR.—On December 22 last she lived on Vega Farm belonging to Salvador Amill in the ward of Bucarabones; she knew Salvador Amill; she knows he is dead because Telesforo Rivera assassinated him; she did not see his body but knows that Telesforo Rivera killed him because he himself confessed at her home that he had murdered him. She saw the deceased for the last time about four o'clock in the afternoon of December 22 washing his hands in the dining-room; she lived in the same house. After he had washed his hands she saw him take the road to the dam; she does not know where he was going; he carried no arms and did not return to the house. Witness knows the defendant; she did not see him on the farm that day and it was about a year since he had left it; he had been a farm hand; he had no quarrel whatever with Amill and was not discharged, but left the farm voluntarily.

"On cross-examination by the defense she said she did not see the deed by which Telesforo Rivera or someone else killed Amill; that she knows it because he confessed it in the house of witness before Arturo Rodríguez, an internal revenue agent, Mocho Roselló, José Sifre, and others; that Telesforo Rivera had been brought there; the chief of police took a statement from him and he voluntarily stated that he had murdered Attorney Amill Negroni; he did not say that they had had a struggle, and witness does not remember if Telesforo Rivera said there whether Amill had attacked him

or whether he had attacked Amill; that she knows Telesforo left the farm because his wife did not wish to gather coffee; that Telesforo had had no quarrel there with anybody.

"JOSÉ SIFRE AMILL.—Telesforo Rivera, the defendant, appeared about 6.30 p. m.; he had a bruise, a protuberance which looked more like it had been caused by a hand than by a stick or other instrument. The bruise was below the right eye, on the cheek-bone; he appeared disturbed and several women there asked him why he was not jovial as on other occasions, and he replied that he was very tired because he had come from Guánica Centrale, where he went looking for work and found none. The wife of Antonio Torres told him that he looked as if he had received a blow and he showed strong emotion; they wanted him to play the harmonica and he played one he had there to amuse himself, which he played every few minutes, but they had to insist because he would stop. He told them he had come by the farm of Piovanetti, one of the jurors at the trial, a farm lying in the middle, Piovanetti's at the right-hand side and that which belonged to the uncle of witness at the left-hand side; that he had passed by there and had fallen in the river; he stumbled when fording it and fell at the other edge; that he had received the bruise there, but afterwards witness looked at the defendant's hands, as it is natural that when a person falls the first thing he does is to catch himself, and he did not see signs of it. His right shoe was wet and a part of the leg of his trousers; he wore shoes of the kind called 'yabucanes' and said he had arrived at three or three-thirty in the afternoon, but that he had gone to the house of his father Zoilo Rivera, and had found there a place to rest.

"ARTURO RODRÍGUEZ.—That he knows the defendant. He saw him at night on Amill's farm, first as a spectator and then as a prisoner; witness did not see him before and knows he made some statements regarding the deed in Amill's home, in the dining-room, where the policeman brought him under arrest; he did not see any violence used toward the accused, who said he had murdered Amill, said statement having been made voluntarily. He had a slight protuberance on his face; he did not use the word 'murdered,' but said he was the author of the crime; that he met Salvador Amill on his farm, the latter coming out to the highway; that he was going along that road; that they met; that Salvador Amill told him he was enticing his employees away; that Salvador Amill invited him to enter the farm after he had answered that it was not true that he was enticing his employees away; that on arriving at a certain place, where he

met Salvador, the latter told him that those were foul dealings and threatened to hit him; that Salvador wanted to shoot him with a revolver, and then he responded with a dagger-thrust.

"On cross-examination the witness answered that the accused made such a statement in the house of Salvador Amill, about two or two-thirty in the morning, spontaneously, under no violence or threats; he was not told to testify in order to obtain a lighter penalty, the witness having heard all the statements made by accused; in sum, that the accused said that Salvador Amill threatened him with a revolver and struck him on his right cheek-bone; that he had killed him because Amill threatened him with a revolver, and on that account he used his knife; that witness was a friend of Amill, the friendship not being very close; they were neighbors, their friendship dated from three or four years ago;. he did not call often at his house, but they often saw each other."

"JUAN BONILLA.—He knows the accused, whose name is Telesforo Rivera, whom he saw last December at Antonio Sifre's, where he used to work, that being the last time he saw him at Sifre's; he did not see him at Salvador Amill's. On December 22d, above referred to, he saw him at night on the *glasis* of Vega Farm which belongs to Salvador Amill, where he talked with him about nine or ten in the evening of said 22d day of December. Afterwards, about midnight or one o'clock in the morning, the accused talking with him, they were arrested and conducted beneath the house. 'I knew there the deceased was found about one or two in the morning; that blood-stained clothes had been found,' and then he said to Telesforo Rivera, 'They have brought blood-stained clothes,' and he answered, 'The coat is mine.' Then witness said, 'The coat is yours?' and he answered, 'That black coat on top which I had.' and witness replied, 'Then it was you who committed the deed?' and he answered, 'It was I.' Witness said to him, 'But, my boy, why did you do that?' and he replied, 'Because I was in my brother's house and when I left I went up the hill to come out at Quemado to the other farm, and when I was going up the hill at the same time Salvador Amill came out from a road on the farm to the highway, where he was going, and when we met each other Salvador called me to the farm,' and the accused told me that as Amill had called him at other times and he had always followed him, on that occasion he did the same thing, and as they went through the farm Amill began using profane language, saying that accused was daring and abusive coming to entice away the laborers, also his brother employed as a foreman; that the accused had regard for

him and immediately Amill hit him a blow on his eye, and the accused grabbed him and told him to stop that, that he did not want to quarrel and would go away, and the other told him, 'What I ought to do is shoot you,' and put his hand in his pocket and the accused thought he was going to shoot him and drew his knife and struck him. That he said that voluntarily and spontaneously, and added, 'I must plead guilty because my clothes have already been found, they have ascertained the facts and if I plead guilty nobody will be kept under arrest, and they will sentence me and I shall serve my sentence and that will be all'; that this was about midnight or one o'clock beneath the house at Vega Farm.

"On cross-examination the witness said that when he had that conversation with Telesforo Rivera the body of Amill had already been found, and that such statements were made in the presence of Francisco Caraballo and another person who heard them, but not the other people because some time before they were taken away; that when Telesforo said that they were already arrested by the police. Telesforo said he wounded Amill because the latter drew a revolver and said he was going to kill him; that, furthermore, Telesforo called Cancel, a policeman, and stated the same thing, and Cancel took him up. Telesforo also said to witness that Salvador had hit him in the eye; that he saw Telesfore had a red bump on one eye.

"ARTURO RACLIX.—Among those arrested was the accused; later the accused was brought out from beneath the house. They had him there examining him. Witness noticed the accused had a discolored eye and in answer to a question regarding it the accused said he fell in the river, but when witness noticed defendant's skin was not broken but was discolored around the eye he asked him, 'Where are you from?' and he answered that he had been at Guánica Centrale and had come through Sabana Grande that same day. Witness accepted his explanation but looked at his clothes, which were quite clean, and asked where he had changed his clothes, and the accused answered that he had not changed them, that he had made the journey in them. Then witness noticed his shirt-collar and caused the policeman to lower the trousers in order to inspect his drawers, which were entirely clean. When the attention of accused was called to this he answered that he had all his clothes at Guánica and that he had used those that he had on all the time. They took the man to a tree and then went to where the body was found, a place about fifteen or twenty minutes distant on foot, because there

are many turns; the distance must be about one and a half kilometers by the farm road through coffee groves. Afterwards they returned to the house; the accused was under the water * * *. They took the accused up to the house because he said he wished to confess. He said those clothes were his; he said that voluntarily, under no threats, violence, or compulsion. * * *. The accused said he desired to confess and that' those clothes were his and continued his confession before a large number of people. Witness believes the chief told the accused to take notice that he was confessing before many witnesses, and he continued frankly stating that he had come to the farm, had met the lawyer, the latter asking him what he was doing there and he answered he had come to see his brother. Some other words followed, the lawyer had struck him, then he lost control of himself, fell upon the lawyer and really did not know what he was doing; that the lawyer·had threatened to kill him. Then witness asked him whether he had seen any revolver and he answered no; that witness again asked the accused if any gesture had been made and he answered no, and that he saw no revolver; that he had received a blow on his eye, perhaps inflicted by the soft fist of a man not used to work, and it was rather discolored.

"ANTONIO AMILL NEGRONI.—That on that night besides knowing his brother had been killed he heard the accused testify, who stated he had killed the brother of witness; that his brother was going along the road with his hands behind him, and then witness's brother turned towards the accused and told him he was enticing away his employees, and immediately struck him and threatened him with a revolver, and then he wounded him; that the accused confessed that before witness who saw the accused that night; that the latter had a contusion on his right eye, a slight contusion over his cheekbone, and at first said it was produced by a coffee branch. Afterwards he said he had been stung by a wasp and that he had hit himself with his hand; that the accused said that the brother of witness had confronted him and had given him that blow and threatened him with his revolver and that then the accused had struck him.

"JUAN CANCEL (I. P.).—They did not touch the body; went to the house where witness saw the accused and arrested him together with all the people who were there; he made use of a number of persons whom he believed incapable of the crime and placed them to guard the doors of the house, which witness enters to ask who were the enemies of the deceased; that he put the accused in a machinery

house and afterwards took him out and asked him where he came
from and noticed the clothes he wore did not fit him. Then he tied
him and gave notice to his chief, who arrived about an hour later,
and turned over the investigation to him; that he went to look for
certain keys; that he knows the chief took possession of certain
clothes; that he tied the accused to an orange tree to inspect his
clothes; that the accused said that four days before he had changed
his clothes at Guánica, and that made witness suspicious because
his clothes were too large and his shoes were wet; that the body
was on the road, which was a narrow one, in a hole; that the ac-
cused, the witness being present, in the parlor of the lawyer's house,
stated that he wanted to testify, that he was afraid to be alone,
and stated that he was the slayer; that going along a road of the
farm he met the lawyer, they had some words and the accused stabbed
him; that there is a road but witness does not know if it is a public
highway, and from the place where the body was found to such road
is about three hundred meters.

"On cross-examination by the defense the witness said that when
he arrested the accused the latter was nervous; that he did not volun-
tarily call witness in order to testify but after having been examined
and while the investigation was being made; that he tied him to the
orange tree because he feared the accused would run away, the wit-
ness being convinced the accused was the slayer; that he remembers
the accused said that the lawyer was his enemy; that once when
working there Amill had put him off the place; that this statement
was made to witness alone while he was making the investigation;
that the body was below the road, about three yards from the road.

"Being questioned by the judge, witness answered that the ac-
cused made other statements before him and other persons more or
less upon the same subject; that he was the author; that witness ex-
amined him before Mr. Arturo and Mr. Arturo Rodríguez, when
the accused made the statement to which witness has testified.

"On re-examination by the defense witness said that the accused
made several statements, once to the witness alone and another time
in the presence of the others who brought him up; that at this time
the accused said—witness does not remember well—he would have
to refresh his memory but he can give the substance. In the presence
of Antonio Amill, Arturo Rodríguez, policeman Quiles and the chief,
the accused said he was going along a road when he met the lawyer,
who wished to make him turn back, and from this the quarrel arose;
that he stabbed Amill with a dagger and then his reason was blinded

and he did not know how many more wounds he inflicted; that on that night the accused showed a contusion on one eye and said that the blow had been caused by a fall in the river, afterwards he said it was received during the fight.

"On re-examination by the judge about what the accused told witness upstairs regarding the blow, witness answered that he believes that as to the blow nothing was said in the house, but he does not remember well; that he does not remember whether when the accused confessed the last time in the presence of all he said that Attorney Amill had struck him, not remembering whether he had previously said to witness that he had fallen in the river or whether after he confessed the crime he told witness that he had received a blow.

"CÁNDIDO LÓPEZ (Chief of Police in Maricao).—Witness took possession of some workmen's clothes in the house of Zoilo Rodríguez—that is to say, Paula Torres—a cashmere coat of an ordinary kind, a dirty undershirt, banana stained, and a pair of drill trousers rather faded by washing. All these clothes were dirty and wet; the trousers were bloodstained and also the left sleeve of the coat six inches from the hem. Those clothes belonged to Telesforo Rivera. The *fiscal* shows witness a pair of trousers, an undershirt, and a coat, and witness recognizes them; says that he took possession of them at the house of Zoilo Rodríguez, whose wife is Paula Torres. The accused said at Vega Farm those clothes were his; that witness went to look for the clothes of his own initiative because he felt suspicious of the accused; * * * that he knows those clothes belonged to the accused because he himself confessed it and voluntarily acknowledged them to be his at Vega Farm in the presence of witness and the people there present. Moreover, he stated he was the slayer. At first when his clothes were taken and acknowledged by him he said he had killed Amill because the latter met him in the road and would not let him go to his house and threatened him with a revolver. The accused was seized with fear and gave Amill the first dagger-thrust and continued to strike him without knowing what he was doing; that Amill gave him a blow with his fist, but at the beginning he said the blow was produced by a fall in the river, and afterwards said it was a blow given by Attorney Amill; that witness noticed that the accused showed a slight bruise on his face, on one of his cheek-bones; he knows the stains on the clothes were blood because they were plainly visible, only for that reason.

"PAULA TORRES.—She knows the accused, by whom she was not employed in any way, having seen him last December at the house of Antonio Sifre; that the accused arrived at the home of witness about three o'clock and asked her whether his suit was in the shed or at the house, saying that she should give it to him in order that he might dress because he had fallen in the river and had received a blow and was wet. She does not remember the day or month, nor is she sure of the hour because she had no watch; that the accused dressed at the home of the witness and left with her a cashmere coat and trousers. She gave him a pair of drawers belonging to her husband, and as to the clothes he took off she does not know whether the policeman brought them here; that he came to her home in great haste, witness being unable to state why. She noticed the bruise on his face; he said it was received when crossing the river; that she did not wash the clothes, which were damp. She hung them up and there the policeman found them. He left no weapon. Certain clothes are shown her and witness identifies them as the clothes brought by the accused to her home.

"ZOLIO RODRÍGUEZ.—Knows the accused, Telesforo Rivera, and Paula Torres, his wife. In December of last year he talked with the accused at Antonio Sifre's; he believes it was on the 16th day of said month. Speaking of the lowland, he told witness it was good and that he would have remained at work down there but his companion left him. Afterwards witness asked him about a bruise he had on his cheek and he answered that he received it in the river when he slipped on a stone; that at supper he took two or three spoonfuls and said he was going to the farm to see if Don Pepito would let him sleep there. That happened about six o'clock Thursday afternoon, but he is not sure about it. After that witness saw him no more. He came to the house of witness because he had left certain clothes when he set out for the lowlands; that he left them there to be done up the day he left for the lowlands; that he left said clothes a few days before going down to Guánica Centrale but not on the same day witness saw him with the bruise on his cheek.

"ANTONIO TORRES.—In December of last year the witness lived at Antonio Sifre's house. He knows the defendant, with whom he talked the last time on the 22d of said month at Antonio Sifre's home; that about six o'clock in the afternoon witness saw a bruise on his face and he told witness that it was produced by a stone in the river. He remained a few minutes at the house of witness and afterwards left for the ridge. He asked witness to lend him a coat

and witness lent him a yellow-striped one; that he was freshly dressed and said he came from Guánica Centrale.

"FRANCISCO ALAMEDA.—In December of last year witness lived at Vega Farm belonging to Attorney Amill. Witness knows the accused, Telesforo Rivera, and in that same month saw him at the house of Joaquín Noel; that was on November 22, witness being sure of that date; that it happened he told witness that should he meet the lawyer there might be trouble; that he came from Guánica Centrale. Witness was at Joaquín's and the accused, who was with him, said he had not found any work; that the accused had a little dagger with a cedar handle and wire fastening; that with said dagger he ate three oranges in the road and they separated at the house of his brother, León Rivera. Witness went from Joaquín's home to Vega Farm with the accused. The house of León Rivera is situated above the establishments of Salvador Amill and within lands belonging to the latter. They arrived at León's house, who was not there, only two children were in the road. The accused told witness that the lawyer was his father and whatever he needed he could get from him. Witness in reply told him not to talk nonsense because the lawyer liked him very much but did not wish to see his mistress, and he said that should he leave his mistress he could come at any time; that that was about one or one and a half years ago; that at the beginning of the period, during which witness was on the Amill farm, the defendant lived there also; that the expression 'nonsense' referred to witness used because both had bad dispositions and Attorny Amill did not want people crossing his farm; that if any employee was not at work he would rebuke him, and much more if he were a trespasser (*uno que fuera particular*). After that accused remained in the house of León Rivera; witness went home and about 6 p. m. they notified him that the lawyer had disappeared, to go and look for him. He went twice and could not find him and in a few minutes the news of his disappearance was spread. On being asked by the *fiscal* as to the exact words used by the accused and which witness had repeated to the *fiscal*, witness answered that he was at the house of his godfather Joaquín Noel. From there they went to León Rivera's house and on the way accused told witness that if he should meet Don Salvador Amill there might be trouble. The *fiscal* asks witness whether he remembers having said, 'I am going this way and if by chance Don Salvador comes around with any nonsense we won't come out very well,' witness answered, 'Yes.' The defense objects because these were leading questions and

the judge rules that witness should be permitted to recollect. Witness says that the accused said that because both were ill-tempered, and also told witness that the lawyer was his father and that whatever he needed he had from him.

"On cross-examination by the defense witness answered that they did not arrive together at his brother's home because the witness went by another way; that witness was never an employee of Mr. Amill; that when the defendant told witness that if he met Mr. Amill they were going to have trouble he said it in a simple way, without any showing of anger and without any threatening words. Witness does not know if they had any previous quarrel.

"On re-examination by the prosecutor he answers that what he has stated did not happen in November but in December, and if he said on November 22d it was because he had forgotten; that he had the conversation with the accused while on the highway; that he ate the oranges with his dagger and then put it back.

"CÁNDIDA CRUZ.—She knows the defendant, Telesforo Rivera, who is a brother of her husband. In December of last year witness lived in Salvador Amill's house and there saw the accused who went to the house of witness on December 2, although she does not recollect the date very well; that on said date her principal, Salvador Amill, had disappeared; that on said date she did not talk with the accused but she knows that he was at her house because he left word that he had been there and was waiting for them because it was late; that her house is situated on Amill's farm, at the side of the road, and from it Amill's house and establishments can be clearly seen."

In view of the new trial to be had we prefer not to discuss this testimony, nor to express any opinion on the facts beyond the bare statement of our conclusion that the circumstances above outlined, without more, do not show the deliberation and premeditation necessary to sustain a conviction of murder in the first degree.

The judgment must be reversed and a new trial granted.

*Reversed and remanded.*

Chief Justice Hernández and Justices Wolf, del Toro and Aldrey concurred.